Filed 5/27/25  P. v. Mooney CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>CHARLES JAMES MOONEY et al.,<br><br>　　Defendants and Appellants. | B321058<br><br>(Los Angeles County<br>Super. Ct. No. YA006449) |

　　APPEALS from orders of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Affirmed.

　　John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Charles Mooney.

　　Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Waters.

　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

In 1991, a jury convicted Charles Mooney and Kevin Waters of, among other crimes, first degree murder and robbery. Mooney and Waters thereafter separately petitioned for resentencing under Penal Code section 1172.6.[1] After an evidentiary hearing under that section, the trial court found that Mooney and Waters were major participants in a felony who acted with reckless indifference to human life and denied the petitions. Mooney and Waters appeal from the trial court's orders denying their petitions, contending there was insufficient evidence to support the trial court's findings. We disagree and affirm the orders.

## BACKGROUND

I.    Evidence at the trial

Mooney and Waters were jointly tried for crimes arising from the murder of an usher at a movie theater during a robbery. When they committed the crimes, Mooney was 17 years old, and Waters was 18 years old. The evidence was as follows.

In January 1991, Dan Barron, Phong Ho, Luis Aguilar, and Donald Hernandez were working at a movie theater in the Del Amo mall.[2] Barron managed the theater, Ho was an assistant

---

[1]    All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[2]    Sam Goldman was also working at the theater that night, but it is unclear whether he was present during the relevant events.

2

manager, Aguilar ran the film projector, and Hernandez was an usher. James Ryan, Greg Deramus, and George De La Fuente were also at the theater on the night of the incident to do a painting job.

Friday and Saturday nights and Sundays were the busiest and most profitable times for the theater. Just after midnight on Sunday, January 13, 1991,[3] one or two movies were still playing. Due to the late hour, the mall was closed, so doors from the theater to the mall were locked. Theater patrons could exit only through two back doors.

Jon Green was at the theater that night watching a movie that started at 10:00 p.m. and ended at 12:40 a.m. The theater had sold 95 tickets for that movie. During the movie, Green noticed two men seated several rows down from him frequently leave and return to their seats, somewhere between three to seven times. The men left toward the end of the movie and did not return. Both men were Black, one man wore a green Notre Dame jacket, and the other man wore a silver and black jacket that possibly said Raiders on it. Green identified Mooney as the man who wore the Notre Dame jacket.

Barron, the theater's manager, left at about 12:30 a.m. As he left, Barron heard strange noises from the projection room upstairs, but he assumed nothing was wrong.

Ho was upstairs with Aguilar in a projection room. When Ho opened the door to leave, he saw two Black men. One pointed a gun 8 to 12 inches from Ho's head. The man with a gun was about 17 or 18 years old and wore a black Raiders jacket with a

---

[3]     The events took place during the late evening of Saturday, January 12, 1991, to the early morning of Sunday, January 13, 1991.

small logo in the chest area.  The man with a gun told Ho and Aguilar to get on the floor.  One of the men asked who was "closing tonight.  Where is the manager?"  Ho replied, " 'No one is here,' " and Aguilar said he did not know.  Someone then restrained Ho's and Aguilar's hands and legs with duct and masking tapes and placed tape over their mouths and eyes.  Ho could hear a voice speaking from a walkie-talkie and the men's footsteps head downstairs to the main lobby.  Just a minute or two later, Ho heard the men return and someone kicked Ho's head two or three times.  The men left again.

Ho freed himself and Aguilar.  Ho tried to phone for help but nobody answered his call.  He and Aguilar then climbed onto the roof using a ladder in a projection room and got the attention of a janitor, who called security.  Ho estimated that 30 to 45 minutes elapsed from when he encountered the robbers to when he got down from the roof.  When Ho and Aguilar got down from the roof, the last movie was letting out.

Meanwhile, Ryan and his fellow painters had arrived at the theater sometime between midnight and 12:30 a.m.  De La Fuente headed into the theater, while Ryan and Deramus stayed outside to discuss the job.  De La Fuente was headed to the storeroom when two men with guns approached him.  A gunman wearing a red ski mask pulled over his face and a Raiders jacket put a gun to De La Fuente's head.  A second gunman wearing a dark ski mask over his face also put a gun to De La Fuente's head.  De La Fuente later identified Mooney as the man in the red mask and Raiders jacket and Waters as the man in the dark mask.[4]  Mooney asked where the manager and money were, and

---

[4]      De La Fuente saw the gunmen's faces when they removed their masks.

De La Fuente answered that he was just a painter. The gunmen took De La Fuente to the office, where a safe was located, and he got on the floor. Mooney continued to ask where the money was, took De La Fuente's wallet and beeper, and threw the wallet to the ground on discovering it did not contain money. Waters spoke into a walkie-talkie. De La Fuente estimated that he was with Mooney and Waters in the office for 10 or 15 minutes.

Ryan and Deramus came to the office, calling out De La Fuente's name in search of him. Someone responded, " 'He's in here.' " The office door opened, and Mooney pointed a gun at Ryan's and Deramus's faces. Deramus also saw the shadow of another person in the room. Mooney told Ryan and Deramus to get on the ground. Ryan asked if he could put out a lit cigarette he was holding. Mooney stepped over Ryan, put the gun to his head, and said, " 'Fuck you and fuck your cigarette.' " Ryan and Deramus heard a click, which Deramus described as a trigger being pulled. Mooney warned Ryan not to come out or " 'I'll kill you.' " Ryan also saw the legs of another man. Mooney left the office and closed the door. Ryan then tried to call for help, but the phone was dead. He later tried to use pay phones in the main lobby, but they too were dead.

Several minutes later, a woman screamed that "he" or "someone" shot her husband. The woman entered the office, and a few seconds later, a bloodied Hernandez, the usher, staggered to the door, said that somebody had shot him, and asked them to call the hospital. De La Fuente drove Hernandez to the hospital, but he died from a gunshot that entered through the left side of

his mouth and travelled to his right middle ear.[5]  Deramus estimated that 8 to 10 minutes elapsed from when he first encountered Mooney to when Hernandez was taken to the hospital.

Police officers arrived at the theater at about 12:35 a.m., at which time patrons were exiting the theater.  The investigating officer examined the theater after the shooting.  The phone lines in the back and front offices had been cut.  Raiders and Notre Dame jackets were in a trashcan next to the projection room.  The Raiders jacket had a receipt with Waters's name and address on it.

An investigation revealed that Waters had worked at the theater as an usher for one day in October 1989, before quitting without notice.  Also, at the time of the murder, Waters's cousin, Anthony Burch, worked at the theater, but he was not on duty that night.  Burch also knew Mooney.  Burch had given movie passes to Waters.

Walkie-talkies were found at Mooney's home.

## II.    Verdict and sentence

In 1991, a jury found Mooney guilty of first degree murder and found a principal gun use allegation true but found a personal gun use allegation not true (§§ 187, subd. (a), 12022, subd. (a); count 1); second degree robbery of De La Fuente with true findings on personal and principal gun use allegations (§§ 211, 12022, subd. (a)(1), 12022.5; count 2); and four counts of assault with a firearm with true findings on personal gun use

---

[5]     The coroner did not find stippling or sooting around the wound to indicate the gun was close to Hernandez's face when he was shot.

6

allegations as to counts 3 and 4 (§§ 245, subd. (a)(2), 12022.5; counts 3 (Ryan), 4 (Deramus), 5 (Ho) & 6 (Aguilar)) but not true as to counts 5 and 6.

The jury reached the same verdict as to Waters, except it found personal use of a firearm allegations not true as to counts 2, 3, and 4.

In 1992, a court sentenced Mooney and Waters each to 25 years to life plus a determinate term of 16 years 4 months.

III.    Postconviction petition for resentencing

Mooney and Waters separately petitioned for resentencing under section 1172.6.  On June 8, 2022, the trial court held an evidentiary hearing on the petitions.[6]  At the evidentiary hearing, the parties did not introduce any new or additional evidence.  Instead, the People relied on the transcripts from the trial, and the parties stipulated to the admission of a report about Mooney prepared by Amy York, a sentencing and mitigation specialist.

The People argued that Mooney and Waters were both major participants in the robbery who acted with reckless indifference to human life.  However, the People conceded it was unknown whether Mooney, Waters, or a third accomplice killed Hernandez.

Mooney's counsel focused on his client's young age of 17 when he committed the crimes, describing him as a "simpleton" and "follower."  He also argued that Waters was the scheme's likely mastermind because he had worked at the theater.

Waters's counsel pointed to the absence of evidence that Waters was the actual killer who intended to kill.

---

[6]     By the time the evidentiary hearing was held, Waters had been paroled.

7

The trial court found beyond a reasonable doubt that Mooney and Waters were major participants in a felony who acted with reckless indifference to human life. In support, the trial court cited evidence that both men were armed, threatened the victims, and tied them up. Although the trial court said it was unknown who fired the fatal shot, both men were armed, ready to use their guns, and knew the other was armed. Further, the incident was of lengthy duration, and the robbery was planned and coordinated. And although the court considered that Mooney was 17 years old at the time of the murder, he was an equal coparticipant in the robbery and murder. Accordingly, the trial court denied both petitions.

## DISCUSSION

I. Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) and subsequent related legislation limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime. (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual

8

killer but, with the intent to kill, acted as a direct aider and abettor, or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile*, at p. 842.)

Senate Bill 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law. (*People v. Lewis, supra*, 11 Cal.5th at p. 959; *People v. Gentile, supra*, 10 Cal.5th at p. 847.) A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder under the current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

II.  Standard of review

On appeal, we review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that

9

is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) We do not resolve credibility issues or evidentiary conflicts. (*Ibid.*) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

III.     *Banks/Clark* factors

The trial court found Mooney and Waters guilty of felony murder as major participants in a felony who acted with reckless indifference to human life under current law. This area of law has its genesis in two United States Supreme Court cases: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137. *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill. (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona*, *supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison. The defendants gave them guns, and the group later kidnapped a family of four. The defendants then stood by while their father debated whether to

10

kill the family and proceeded to shoot the family, including a toddler and a teenager. (*Id.* at pp. 139–141.) The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements. *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*. Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in

11

killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,'" that is, whether defendant's conduct "'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.'" (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*) [summarizing *Clark* factors].)

In evaluating the sufficiency of evidence to support a trial court's finding that the *Banks*/*Clark* factors are established, no one factor "'is necessary, nor is any one of them necessarily sufficient.'" (*Clark, supra*, 63 Cal.4th at p. 618.) Rather, we evaluate the factors under the totality of the circumstances to determine a petitioner's place on the culpability spectrum. (*Scoggins, supra*, 9 Cal.5th at p. 675.)

12

IV. Mooney

Mooney does not address the major participant prong of the analysis, thereby conceding that prong.  He instead argues that there is insufficient evidence he acted with reckless indifference to human life.  Cognizant that the *Banks* and *Clark* factors overlap, we therefore focus our analysis on that prong of the inquiry.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 615 [significant overlap exists between factors establishing two prongs].)

A.   *Sufficient evidence supports the reckless indifference to human life finding*

Mooney's contention that there is insufficient evidence he acted with reckless indifference to human life relies heavily on the absence of evidence of his role in Hernandez's shooting.  To be sure, the evidence does not conclusively establish that Mooney was the shooter, with the shooter when Hernandez was shot, or had an opportunity to restrain the shooter.  In such circumstances, where a defendant was not present during the killing or had an opportunity to restrain the crime, a reckless indifference finding may not be warranted.  (See, e.g., *Banks*, *supra*, 61 Cal.4th at pp. 805, 807 [insufficient evidence that getaway driver who was not present during killing acted with reckless indifference to human life; *Scoggins*, *supra*, 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed] (*Ramirez*); *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant

13

present during robbery but not " 'close enough' " to restrain shooter] (*Moore*).)

We agree with the trial court that the moments around the shooting of Hernandez are opaque and could have involved the third party to whom Waters was talking on the walkie-talkie. That being said, the evidence still raises a reasonable inference that Mooney and Waters were present when Hernandez was shot. Mooney and Waters were together during key events: they sat in the movie together, got up and left multiple times together, restrained Ho and Aguilar in the projection room together, and restrained the painters in the office together. And although Waters spoke to a third party over a walkie-talkie, no witness ever saw or heard a third party with Mooney and Waters in the theater. And, as meaningful as a defendant's presence during a shooting is to the overall analysis, it is not the sole factor to determine a defendant's place on the culpability spectrum. (*People v. Montanez* (2023) 91 Cal.App.5th 245, 281–282.)

Turning to those other factors, Mooney concedes he was a major participant in these crimes. The evidence shows that Mooney knew about the plan and executed it. He and Waters went to the theater; attended a movie but got up frequently during it, inferentially to case the theater; armed himself with a gun and with tape to restrain victims; disguised himself with a mask; and cut phone lines to eliminate the possibility of help for the victims. There was also evidence that Mooney supplied the walkie-talkies, because walkie-talkies were found at his home. The robbery therefore was carefully orchestrated and preplanned.

Mooney clearly knew that lethal weapons would be used, as he and Waters both had guns. Further, Mooney personally used his gun by pointing it at De La Fuente, Ryan, and Deramus.

14

While the mere fact a robbery involved a gun is insufficient by itself to support a finding of reckless indifference to human life, the presence of two lethal weapons is nonetheless relevant to the required mens rea and weighs in favor of the trial court's conclusion, even if it is not dispositive.  (See generally *Scoggins*, *supra*, 9 Cal.5th at p. 682 [anyone who plans or participates in armed robbery anticipates lethal violence might be used, given that one in 200 armed robberies results in death, even though that alone does not establish reckless indifference to human life].)

Next, the evidence supports a finding that Mooney was present during critical events.  He and Waters went to the movie together, left the movie and returned to it together multiple times, restrained Ho and Aguilar in the projection room together, put De La Fuente, Ryan, and Deramus in the office together, and, inferentially, fled together.  (See, e.g., *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 592 [reckless indifference found where defendant was present at every stage of crime:  "planning, execution, dividing the spoils, and flight"].)  As we have said, although there were no witnesses to the shooting of Hernandez, he was shot just minutes after Mooney and Waters put the painters in the office.  Therefore, it is reasonable to infer that Mooney was present when Hernandez was shot.

Further, there is no evidence Mooney tried to minimize the risk of violence.  To the contrary, there is more than sufficient evidence that the robbery was planned in a way to maximize the risk of violence.  Saturday nights and Sundays were the theater's busiest times, and this was when the crimes occurred, from late Saturday night to early Sunday morning.  Due to the late hour, exit routes were limited because doors to the mall had been locked.  It is reasonable to infer that Waters knew all of this,

15

because he had worked at the theater, and his cousin still worked at the theater.  It is further reasonable to infer that Waters told Mooney that the theater made the most money on the weekends, so they should rob it then.  Moreover, based on ticket sales, there were 95 patrons, in addition to staff, in the theater during the robbery and murder.  The high number of people in the theater created a grave risk of increased violence.  (Compare *People v. Owens*, *supra*, 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed], with *Clark*, *supra*, 63 Cal.4th at pp. 621–622 [plan to rob closed store minimized risk of violence].)  Indeed, Green testified that while he was watching the movie, he thought he heard a gunshot.  Thus, committing the robbery while a large number of people were in the theater increased the risk that staff or a patron would happen upon the robbers.  Finally, the robbers cut phone lines, thereby diminishing the possibility of help for the victims.  This factor therefore strongly supports the reckless indifference finding.

There is, however, no evidence that Mooney knew about any propensity for violence Waters had.  This factor therefore weighs against a finding of reckless indifference to human life.  (See generally *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 [finding " 'significant' " the lack of evidence that the petitioner knew of his confederates' "violent propensities"].)

Next, the crime was of prolonged duration, and there was a greater opportunity for violence because victims were restrained during that time.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 620.)  The evidence suggests that Mooney and Waters were in the theater for hours, as the movie started at 10:00 on Saturday

evening, and Green saw them get up multiple times during the movie. Victim Ho estimated that 30 to 45 minutes elapsed from when he first encountered Mooney and Waters in the projection room to when he got down from the roof. Thus, the crucial events lasted for around an hour, although Mooney and Waters were in the theater for hours. During that time, Mooney restrained two separate groups of people: (1) Ho and Aguilar in the projection room and (2) De La Fuente, Ryan, and Deramus in the office. Mooney and/or Waters also bound Ho's and Aguilar's legs and hands with tape, and placed tape over their eyes and mouths. Restraining so many people in separate areas greatly increased the risk of violence. (See, e.g., *Tison v. Arizona*, *supra*, 481 U.S. at pp. 140, 151 [victims were kidnapped, driven to remote location, detained at gunpoint, and killed]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant enabled murder by using gun to keep victims at bay during bank robbery].)

Moreover, Mooney made statements and took actions more clearly exhibiting a reckless indifference to human life. When Ryan asked if he could put out his cigarette so he wouldn't start a fire, Mooney stood over him, put a gun to his head, and said he did not give a fuck about the cigarette and " 'fuck you.' " Ryan and Deramus heard a click, which Deramus described as a trigger being pulled. Mooney warned Ryan not to come out or " 'I'll kill you.' " This evidence therefore supports a finding that Mooney was willing to kill and that he or Waters pulled a gun's trigger, an act incredibly dangerous to human life.

Finally, there is no evidence Mooney tried to help Hernandez. Instead, the evidence supports a finding that he did not help him, because Hernandez's wife discovered her bleeding husband, who though critically wounded and bleeding, managed

17

to stumble to the office for help.  Such callous behavior of abandoning a man shot in the face supports the reckless indifference finding.  (See, e.g., *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to aid or comfort victim]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].)

And although Mooney argues that people were present who could help Hernandez, he and Waters had restrained staff working at the theater, thereby hindering them from helping Hernandez.  Mooney and Waters also cut phone lines, thereby eliminating the possibility the victims could call for help.  And doors to the mall were locked, so the victims had limited avenues of escape.  This case is therefore not like *In re Taylor* (2019) 34 Cal.App.5th 543.  In that case, the defendant fled the scene despite knowing that the victim had been shot.  (*Id.* at p. 559.)  However, there was no evidence the defendant knew how badly the victim was wounded, and there was evidence the defendant thought help was arriving.  (*Ibid.*)  Here, however, if Mooney and Waters were present when Hernandez was shot—and it is reasonable to infer they were—then the gravity of Hernandez's wound was unmistakable.

Therefore, while it cannot be conclusively determined whether Mooney was the shooter or present when Hernandez was shot, the totality of the circumstances nonetheless support the trial court's finding that Mooney acted with reckless indifference to human life.  Those circumstances include the detailed planning involved in the event, the use of two guns, planning the robbery for a time when numerous people (staff and theatergoers) would

18

be present, restraining two groups of people in different rooms, pointing a gun at Ryan, Deramus and De La Fuente, putting a gun to Ryan's head, and threatening to kill Ryan.

B.     *Mooney's cases are distinguishable*

Mooney urges us to follow *Moore*, *supra*, 68 Cal.App.5th 434, *People v. Keel* (2022) 84 Cal.App.5th 546 (*Keel*), and *People v. Guiffreda* (2023) 87 Cal.App.5th 112 (*Guiffreda*), all of which involved juveniles like Mooney or young adults.

In *Moore*, *supra*, 68 Cal.App.5th at page 439, the defendant was 16 years old when he and accomplices stole a car. An accomplice got out of the car, robbed several people in a parking lot, and suddenly shot and killed one of them. The court found the evidence insufficient to support a finding the defendant acted with reckless indifference to human life because he did not use a gun, did not leave the car when the shooter got out, was not close enough to restrain the shooter, the shooting was sudden and unprovoked, and the defendant did not know of the shooter's violent propensities. (*Id*. at pp. 452–453.) Further, the defendant's age showed he did not adequately appreciate the risk of death his criminal activities posed. (*Id*. at p. 454.)

In *Keel*, *supra*, 84 Cal.App.5th at page 550, 15-year-old Keel and an accomplice, both of whom had guns, robbed the victim and one of them shot and killed the victim, with some evidence suggesting that the accomplice was the shooter. The court found that there was insufficient evidence Keel acted with reckless indifference to human life, relying heavily on the quickness of the decision to rob the victim, that the robbery was not preplanned, and that the shooting occurred in response to the victim's unexpected resistance. (*Id*. at p. 560.) As for Keel's age, the court noted that, in addition to the hallmark features of

19

youth, there was evidence he was especially vulnerable to outside pressures, having associated with a gang since he was just six years old. (*Id.* at p. 562.) Thus, the court concluded that Keel "participated in a crime of opportunity in which death occurred" and did not have the requisite mens rea. (*Ibid.*)

Finally, in *Guiffreda*, *supra*, 87 Cal.App.5th at page 117, the 19-year-old defendant, her husband, and a third man were evicted from their motel room. The victim was staying at the same motel and was observed with a thick bank envelope in his pocket. The defendant went into the victim's room, followed by her two accomplices. The victim was found dead from multiple blunt force head injuries. (*Id.* at p. 119.) The defendant told someone that the plan had been for her to have sex with the victim and for her accomplices to assault him, but she also intimated that killing the victim had not been her intent. The court found that there was insufficient evidence the defendant acted with reckless indifference to human life because she did not use a weapon or know one would be used; she was not part of a preconceived plan to beat the victim with a fatal instrument; there was evidence she was not present when an accomplice retrieved the weapon used to beat the victim; she left the victim's room without her accomplices, which could suggest she rejected what they had done; the crime was of short duration; and she did not know her accomplice was likely to use lethal force. (*Id.* at pp. 126–127.)

*Moore*, *Keel*, and *Guiffreda* are distinguishable. Mooney and his accomplice carefully planned the robbery, bringing guns to restrain victims, masks to hide their identities, tape to restrain victims, and walkie-talkies for communication. Thus, this was not a crime of opportunity as in *Keel* or spontaneous as in

20

*Guiffreda*; instead, it was preplanned and calculated. Nor was this a crime of short duration as in any of those cases; instead, it occurred over almost an hour and involved restraining two groups of people in different rooms and a theater full of almost 100 people, any of whom could have wandered into the main part of the theater and encountered the robbers.

Moreover, as did the *Moore* and *Keel* courts, the trial court here considered Mooney's young age, 17. A defendant's young age when committing a crime should be considered when determining whether the defendant acted with reckless indifference to human life. (See, e.g., *Ramirez, supra*, 71 Cal.App.5th at p. 987; *Moore, supra*, 68 Cal.App.5th at p. 454.) That is, the hallmarks of youth include immaturity, impetuosity, and an inability to appreciate risks and consequences. (*Ramirez*, at p. 991.) Youthful defendants' background, mental and emotional development, and susceptibility to outside pressures are therefore relevant in assessing culpability. (*Ibid.*)

Here, the parties stipulated to the admission of York's mitigation report, which discussed Mooney's background. Mooney grew up with his parents and siblings. He reported that his father was controlling and abusive, and he felt rejected by his father and older brothers. Although his mother was loving and supportive, she was submissive and unable to compensate for the negative relationships in her son's life. Mooney began abusing substances around the age of 12 or 13, and he then began hanging out with gangs. At the age of 14, he was made a ward of the court and placed home on probation. York found that due to Mooney's young age when he committed his offenses, he was vulnerable to the negative influences of his family and surrounding environment.

21

Mooney argues that the trial court failed to consider the report and his young age when he committed his crimes. The record does not support that argument. At the evidentiary hearing, the trial court stated, "I will accept that stipulation [to admit the report] and will consider Ms. York's report." Then in ruling, the trial court said it had considered Mooney's young age when Hernandez was killed, but found it insufficient to override the other factors showing that he was an equal coparticipant in the robbery and murder. As we have discussed, the record supports that finding. Indeed, the evidence shows that Mooney took the lead in restraining and communicating with the victims and searching for money. We therefore disagree that *Moore*, *Keel*, and *Guiffreda* or York's report compel a different conclusion.

V.   Waters

Waters also concedes he was a major participant in the robbery but argues that there was insufficient evidence he acted with reckless indifference to human life. For the same reasons that we rejected this argument as to Mooney, we reject it as to Waters.

The evidence suggests that Waters masterminded the robbery. (See, e.g., *Clark*, *supra*, 63 Cal.4th at p. 612 [Clark masterminded attempted robbery and orchestrated events at crime scene].) Waters had worked at the theater in 1989, quitting after just one day. Although the robbery did not take place until about a year and a half later, that Waters abruptly quit his job at the theater raised a reasonable inference that he got the job for the purpose of scoping out the theater to rob it in the future. Having familiarity with the theater by virtue of his former employment there, as well as through his cousin Burch

22

who still worked at the theater, Waters would have known the theater's layout, that weekends were the most profitable times, and how money was handled.

As with Mooney, the evidence does not conclusively establish that Waters shot Hernandez, had an opportunity to restrain the shooter, or was present when Hernandez was shot. Still, given that Mooney and Waters were together during all other key events—including, restraint of the victims—and a third accomplice was never seen, it is reasonable to infer that Waters was present when Hernandez was shot.

Moreover, Waters was armed with a gun, and he knew that Mooney was armed with a gun. Therefore, while the fact that Waters and Mooney were armed is insufficient by itself to find that Waters acted with reckless indifference to human life, it remains a significant factor supporting that mens rea. (See generally *Clark*, *supra*, 63 Cal.4th at p. 618 [even if evidence does not establish who killed victim, defendant's firearm use can be significant to analysis of reckless indifference to human life].)

Next, the critical portion of the event lasted about an hour. However, Waters minimizes the event's prolonged duration by characterizing it as a "series of somewhat isolated incidents as opposed to a single confrontation," so that "its overall duration appears to have had little if any causal relation to the murder." To the contrary, this was one lengthy, cohesive event that culminated in Hernandez's murder. (*Clark*, *supra*, 63 Cal.4th at p. 620 [when victims are restrained in perpetrators' presence for prolonged periods, there is a greater opportunity for violence, possibly culminating in murder].) Waters helped his accomplice Mooney restrain two groups of victims in two separate areas, a

projection room and the office.  As we have said, restraining victims for lengthy periods of time increased the risk of violence.

Waters also dismisses his help in restraining the two groups of victims in different rooms as resulting in no "significant" violence.  The evidence does not support this characterization of what happened.  Rather, the evidence shows that either Waters or Mooney violently and gratuitously kicked Ho in the head, even though Ho was already bound, gagged, and defenseless on the ground and did nothing to provoke that violence.  And the evidence shows that Waters was present when Mooney put a gun to Ryan's head and said, " 'fuck you' " and threatened to kill Ryan.  Either Mooney or Waters pulled a trigger, which is direct evidence of reckless indifference to human life.  There is no evidence that Waters contradicted Mooney or disagreed with Mooney's threat to kill Ryan.

Nor do we agree that Waters minimized the risk of violence by planning the robbery to take place at closing time.  He planned the robbery for the busiest time, a weekend night.  Moreover, Waters was in the theater where the movie was playing and would have seen that about 95 moviegoers were present.  There was a risk that those moviegoers would encounter the robbers while going to, for example, the concession stand or bathroom.  Yet, the evidence shows that Waters and Mooney began to execute their plan *before* the movie let out, while people were still watching the movie.  Waters is therefore not like the defendant in *Clark* who planned to rob a store after it closed, when customers had gone home and only a few staff were remaining.  (*Clark*, *supra*, 63 Cal.4th at pp. 621–622.)

There is no evidence Waters knew about any propensity Mooney had for violence *before* these events.  (See generally *In re*

24

*Bennett*, *supra*, 26 Cal.App.5th at p. 1025.) However, Mooney's violent nature became clear *during* the events. (See generally *People v. Nieber* (2022) 82 Cal.App.5th 458, 479 [although Nieber did not know about cohorts' likelihood of killing, he knew they brought a weapon and were using it].) Mooney pointed his gun at close range to victims, and he threatened to kill Ryan. (See, e.g., *People v. Montanez*, *supra*, 91 Cal.App.5th at p. 273 [pointing gun directly at victim is an implicit threat to shoot the victim].) At least at that point, Mooney's violent propensities and willingness to kill were unmistakable. Yet, there is no evidence that Waters, despite observing Mooney's violent conduct, tried to calm Mooney or to tamp down the violence.

Next, Waters, like Mooney, did not aid the gravely wounded Hernandez. Instead, he and Mooney fled the scene, but not before cutting phone lines and restraining staff and others who might have been able to help Hernandez. Indeed, De La Fuente had to drive Hernandez to the hospital, instead of calling for an ambulance.

Finally, Waters also argues that his young age at the time of the crimes, 18, weighs against a finding he acted with reckless indifference to human life. Youth is a relevant factor to consider when determining a defendant's culpability for a crime. (See, e.g., *Ramirez*, *supra*, 71 Cal.App.5th at p. 987; *Moore*, *supra*, 68 Cal.App.5th at p. 454.) However, aside from the bare fact of his youth, Waters does not explain why or how his age and background played a role in his behavior that night. (E.g., *Keel*, *supra*, 84 Cal.App.5th at p. 562 [evidence that juvenile defendant was susceptible to peer pressure].)

Given the totality of the circumstances, which include Waters's planning activities, that he and Mooney armed

25

themselves with guns, that multiple victims were restrained at gunpoint and one was beaten and another threatened with death, and the lengthy duration of this event, sufficient evidence supports the trial court's conclusion that Waters was a major participant in a felony who acted with reckless indifference to human life.

## DISPOSITION

The orders denying Charles Mooney's and Kevin Waters's Penal Code section 1172.6 petitions are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.